UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROSE A. SOTAK,

                    Plaintiff,

          -v-                                    3:18-CV-288

FRANK BERTONI, ROBERT
MACK, THOMAS R. AUGOSTINI,
LEONARD J. PERFETTI, JOHN
DOE NO. 1, JOHN DOE NO. 2,
JOHN DOE NO. 3, and JOHN
DOE NO. 4,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                            OF COUNSEL:

HINMAN, HOWARD LAW FIRM                 ALBERT J. MILLUS, JR., ESQ.
Attorneys for Plaintiff                 JEFFREY A. JAKETIC, ESQ.
P.O. Box 5250
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902

BAILEY, JOHNSON & PECK, P.C.             CRYSTAL R. PECK, ESQ.
Attorneys for Defendants
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, NY 12205

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On February 8, 2018, plaintiff Rose A. Sotak ("Sotak" or "plaintiff"), the former

Supervisor of the Town of Union (the "Town"), filed this civil rights action in Supreme Court,

Broome County, against defendants Town Board Members Frank Bertoni ("Bertoni"), Robert Mack ("Mack"), Thomas R. Augostini ("Augostini"), Town Clerk Leonard J. Perfetti ("Perfetti"), and John Doe Nos. 1 through 4 (the "Does").

According to Sotak's original, seven-count state court complaint, the all-male Board defendants conspired to remove her as Town Supervisor in violation of 42 U.S.C. § 1983 and related state law by causing her to be investigated for workplace misconduct, publicizing the results of this investigation, and then using the whole affair to instigate a criminal prosecution by the Broome County District Attorney's Office (the "DA's Office").  *See* Dkt. Nos. 1-2, 8.

On May 18, 2018, shortly after they removed the case to federal court, Dkt. No. 1, defendants moved under Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss Sotak's complaint in its entirety based on their contention that, *inter alia*, her pleading failed to plausibly allege any actionable misconduct by the Board members.  Dkt. No. 12.  According to defendants, the Board chose to investigate plaintiff after receiving multiple complaints about her workplace behavior from subordinate Town employees.  *Id.*  In defendants' view, this personnel investigation was not improper just because plaintiff felt wronged by it.  *Id*.

On June 6, 2018, Sotak amended her pleading as of right, Dkt. No. 16, and defendants' first motion to dismiss was denied as moot, Dkt. No. 20.  Plaintiff's seven-count amended complaint asserted a § 1983 Equal Protection claim for gender discrimination, Am. Compl. ¶¶ 61-69, malicious prosecution claims under § 1983 and state law, *id*. ¶¶ 70-80, 85-86, a § 1983 conspiracy claim, *id*. ¶¶ 81-84, a state law claim for defamation, *id*. ¶¶ 87-95, a state law claim for intentional infliction of emotional distress, *id*. ¶¶ 96-101, and a *prima facie* tort claim under state law, *id*. ¶¶ 102-07.

On August 3, 2018, defendants renewed their pre-answer motion to dismiss against

Sotak's amended complaint.  Dkt. No. 23.  The Court heard oral argument on November 26, 2018 and denied defendants' motion from the bench.  Dkt. No. 34.  Thereafter, the parties completed discovery.  They also tried and failed to reach a mediated resolution.  Dkt. No. 74.

On July 8, 2020, defendants moved under Rule 56 for summary judgment based on their renewed contention that Sotak has not marshaled evidence in discovery from which a reasonable jury could find in her favor on any of her claims.  Dkt. No. 65.  The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

## II.  **BACKGROUND**

The Town is situated in Broome County.  Sotak Decl., Dkt. No. 70-2 ¶ 5.  The Board (defendants prefer to call it the Council) is the Town's governing body.  Defs.' Rule 7.1(a)(3) Statement ("Defs.' Facts"), Dkt. No. 70-3 ¶¶ 1-2.  The Board (or Council) is composed of one Supervisor, who serves a two-year elective term, and four Board members (or Councilmen), who serve four-year elective terms.  *Id*. ¶ 4.

Aside from these five elected officials, the Town also employs about 160 other people if you exclude seasonal staffing.  Defs.' Facts ¶ 2.  And although many of these workers enjoy civil service and union protections, the Town's eight department heads do not:  with the exception of the Town Clerk (who is elected), the other seven heads are at-will employees who report to the Supervisor.  *Id*. ¶¶ 3-4; *see also* Pope Aff., Dkt. No. 65-28 ¶ 9.

The Supervisor "is the Chief Executive Officer and the head of the administrative branch of Town government."  Pope Aff. ¶ 6.  Because this official "is responsible for the administration of the general day-to-day operations of the Town," the position requires the Supervisor "to be in direct regular contact with Town employees, particularly the Town

department heads."  *Id*.  In addition to being in charge of daily operations, the Supervisor is also responsible for appointing a Deputy Supervisor and for naming individual Board members to various Town Committees.  Defs.' Facts ¶¶ 5, 17.  The Deputy Supervisor has authority to act whenever the principal officeholder is unable to discharge the duties of office. *Id*. ¶ 5.  And the various Town Committees, chaired by Board members, are responsible for managing various aspects of Town governance.  *See id*. ¶ 17.

Sotak is a realtor who lives in the Town.  Sotak Decl. ¶¶ 4-5; Ex. G to Peck Decl. ("Sotak Dep."), Dkt. No. 65-8 at 7:7-17.  In 1998, plaintiff won election to the Board.  Sotak Decl. ¶ 6; *see also* Defs.' Facts ¶ 6.  Plaintiff ran and won re-election to her Board seat in 2003 and again in 2007.  Sotak Dep. at 15:1-4, 16:3-6.

In 2011, then-Town Supervisor John Bernardo announced that he planned to resign from the Town so that he could take a position in the Broome County government.  Defs.' Facts ¶ 12; Sotak Dep. at 26:11-15.  With the exception of defendant Mack, Sotak and the three other named defendants (Bertoni, Augostini, and Perfetti) all held Board seats at the time of Bernardo's announcement.  *Id*. ¶ 11.

Bernardo's resignation led to some political wrangling.  Augostini was the Deputy Supervisor under Bernardo and would ordinarily have succeeded him to become Acting Supervisor until an election could be held, but Sotak convinced Augostini to let Bernardo appoint her as Deputy Supervisor instead.  Defs.' Facts ¶ 13.

According to Sotak, defendant Bertoni actually wanted to be named Supervisor at this time, but he could not get the rest of the Board to agree to it.  Sotak Dep. at 27:12-20. Instead, Augostini relented and Bernardo appointed plaintiff as Deputy Supervisor with the full support of the Board.  *Id*. ¶ 14.  And when Bernardo's resignation as Supervisor became

effective, plaintiff was named Acting Supervisor.  *Id*. ¶ 6; Sotak Decl. ¶ 6.

In 2013, Sotak won election as Town Supervisor.  Defs.' Facts ¶ 6.  In January 2015,

the Board's composition changed when Mack, a named defendant, won election to plaintiff's

open Board seat.  *See* Mack Aff., Dkt. No. 65-25 ¶ 1.  Mack joined fellow Board members

(and defendants) Bertoni, Augostini, and Perfetti, who all had long relationships with plaintiff

from their years together on the Board.  *Id*. ¶ 4.

Sotak, now the duly elected Town Supervisor, appointed Mack and Perfetti to co-chair

the "Employee and Safety Committee," which the parties also refer to the "Employee

Committee."  Defs.' Facts ¶¶ 18, 20.  The Employee Committee hears and investigates

employee complaints and reports the findings to the Board.  *Id*. ¶ 19.  However, a review of

defendants' affidavits and other filings indicate that this Committee was not a particularly

busy assignment—employee complaints were infrequent, and any complaints about

employees who were covered by a union bargaining agreement (which was almost all of the

Town's 160 employees) were handled through other avenues.[1]

The events giving rise to this lawsuit begin with a complaint about Sotak's workplace

behavior.  On June 15, 2016, Bertoni sent an e-mail to fellow Board members Mack and

Perfetti and to Town Attorney Alan Pope and Town Comptroller Laura Lindsley.  Defs.'

Facts ¶ 21.  According to this e-mail, Bertoni had received complaints about plaintiff from

Town employees and wanted to discuss how best to proceed.  Ex. I to Peck Decl., Dkt. No.

65-10.  Bertoni's e-mail stressed that these employee complaints needed "to be kept

---

[1]  Plaintiff testified in her deposition that the Town used to have a Human Resources ("HR") named Pat Plunger, but she retired or left and her personnel functions were taken up by the Employee Committee.  Sotak Dep. at 23:6-11.  According to Bertoni and Mack, HR duties were also handled by the Town Comptroller.  Bertoni Aff., Dkt. No. 65-24 ¶ 20; Mack Aff., Dkt. No. 65-25 ¶ 7.

confidential within the employee[ ] committee." *Id*.  Plaintiff was excluded from this e-mail exchange.  Defs.' Facts ¶ 22.

According to defendants, Sotak found out about the e-mail anyway.  Defendants contend that plaintiff showed up at a Board meeting that was held later that day with a copy of Bertoni's "confidential" e-mail.  Defs.' Facts ¶ 24.  As Mack explained in his affidavit, plaintiff was able to read this e-mail because plaintiff's assistant had an administrative password that gave her access to "all emails to and from Town personnel." Mack Aff. ¶ 10.

Defendants contend Bertoni refused to answer any of Sotak's questions about the e-mail or about the employee's complaint "because of the complainant's request for confidentiality."  Mack Aff. ¶ 25.  Plaintiff, for her part, testified that she does not really remember these events and claims that she did not learn about this personnel complaint until a short time later.  *See* Sotak Dep. at 41:2-9.

It turns out this complaint had been made by Joseph Moody, the Town's Director of Economic Development.  Defs.' Facts ¶ 26.  As a department head, Moody was one of the few at-will employees employed by the Town.  *Id*.  The parties agree that Moody had verbally complained to Bertoni about Sotak's allegedly "harassing and bullying behaviors."  *Id*.; *see* Sotak Decl. ¶ 8.

However, after the contentious Board meeting where Sotak asked about the e-mail exchange from which she was excluded, Moody asked Bertoni if he could withdraw his complaint.  Defs.' Facts ¶ 27.  In defendants' telling, Moody was nervous—if plaintiff already knew about the complaint and who sent it, then any investigation into the allegations obviously could not "remain confidential."  *See id*.

After Moody withdrew his complaint, Sotak won re-election as Town Supervisor.  *See*

Sotak Decl. ¶ 6.  In January of 2017, Perfetti stepped down from the Employee Committee.  Defs.' Facts ¶ 28.  Because Perfetti's absence left open a seat on the Committee, plaintiff appointed Bertoni to replace him as co-chair.  *Id*.  Going forward, Mack and Bertoni co-chaired the Employee Committee.  *Id*.

That same month, Bertoni says he received two more complaints about Sotak's alleged workplace misconduct.  The first was again from Moody, who complained to Bertoni that plaintiff "was continuing to harass and intimidate him."  Defs.' Facts ¶ 29.  According to defendants, Moody alleged that plaintiff "was threatening to have [him] fired and claiming that she had Town Board approval to do so" and that plaintiff "would yell and use profanity when addressing him."  *Id*. ¶ 30.  Second, Bertoni received a complaint about plaintiff from a different department head (another at-will employee) whose name has been redacted from the parties' filings.  *Id*. ¶ 31.  According to this unidentified second complainant, plaintiff "was repeatedly threatening to have [the employee] fired" and would often yell at the employee.  *Id*.

Sotak, for her part, admits she was a "hard taskmaster."  Sotak Decl. ¶ 8.  According to plaintiff, she "perceived that certain Town employees, particularly the Director of Economic Development Joseph Moody, were not doing their jobs to [her] satisfaction."  *Id*.  Plaintiff contends she "had conversations with the employees urging them to do better," and although she "use[d] hard language" at times, it was "strictly as an aid to improve employee performance."  *Id*.  In particular, plaintiff believed Moody was doing a completely unsatisfactory job as Director of Economic Development.  Sotak Decl. ¶¶ 15-16.  Plaintiff denies ever threatening to fire Moody, but claims she did warn him his job was in jeopardy due to budget cuts and his continued poor performance.  *Id*.

The Board claims they saw the employee complaints in a different light.  Defendants contend that they viewed the complaints as serious, and that they wanted to take them seriously.  Board members Mack and Bertoni met with Alan Pope, the Town Attorney, "to request that he conduct an investigation" into the complaints about Sotak.  Defs.' Facts ¶ 34.

According to defendants, Pope demurred, explaining that he "had personally observed and experienced" plaintiff's "temper and similar such threats" and "felt that [he] could not be both a witness and an investigator of the complaints."  Pope Aff. ¶¶ 25-26.  Town Attorney Pope recommended to Mack and Bertoni that the Town "retain outside labor law counsel to conduct the investigation."  Defs.' Facts ¶ 36.  The Board members hired Paul Sweeney, a labor attorney at Coughlin & Gerhart, LLP in Binghamton, New York, to investigate the employee complaints.[2]  Defs.' Facts ¶¶ 37, 46-48.

Sotak contends she was completely excluded from this entire decision-making process.  Among other things, she asserts that she was never given an opportunity to vote on whether to hire Attorney Sweeney or his law firm—which would involve approval for the use of Town funds.  See Sotak Decl. ¶10.  According to plaintiff, the Board had started to hold executive meetings without notifying her and began to exclude her from portions of certain meetings at which she was present.  See, e.g., Sotak Dep. at 68:24-69:18, 70:5-21.

Sotak contends that other employee complaints against Town officials were handled far differently.  Sotak Dep. at 113:8-114:11; 116:16-24, 119:15-120:3.  For instance, plaintiff recalls the time a male Town employee "got into" some kind of verbal or physical altercation with Perfetti, then a Board member, at the Dick's Open, an annual golf tournament partially

---

[2]  There is some dispute in the papers about Sweeney's hiring.  It looks like the Board members quietly hired Sweeney and then retroactively voted on the hire at a later Town Board meeting.  Sotak contends this was improper, but defendants claim that retroactive votes are not all that unusual.

sponsored by the Town.  Sotak Dep. at 46:2-47:21.

This altercation was sufficiently serious that police were needed to break things up.  Sotak Dep. at 46:2-47:21.  But rather than hire outside labor counsel to investigate, the Board directed Kurt Schrader, the Deputy Town Attorney, to look into the matter and report back.  *Id*. at 48:7-50:8.  According to plaintiff, Schrader reported his findings to the Board and recommended no further action against either Perfetti or the other male employee.  *Id*. at 51:1-53:10.

Sotak also testified that at least one employee had made a complaint against Town Attorney Pope.  Sotak Dep. at 32:3-12.  According to plaintiff, that complaint was handled informally (by plaintiff, in fact).  And in their own submissions, defendants acknowledge that complaints made against non-union employees were ordinarily "investigated internally" and then handled in house by the Board.  Mack Aff. ¶ 7.

In Sotak's case, the Board went a step further than just hiring outside counsel.  On January 24, 2017, Bertoni and Mack circulated a memo to the Town's department heads on Town letterhead that indicated the "Employees Committee has learned of one or more incidents of alleged workplace harassment or inappropriate workplace conduct by Supervisor Sotak."  Ex. J to Peck Decl., Dkt. No. 65-11; Defs.' Facts ¶ 38.  Sotak was completely excluded from defendants' decision to draft and circulate this memorandum.  Sotak Decl. ¶ 9.

The memo explained that Town Attorney Pope "has recommended to the Board that under the circumstances we retain independent counsel to conduct the investigation into these and other related incidents."  Ex. J to Peck Decl.  As relevant here, the memo also instructed that:

> Effective immediately all communication with the Town Supervisor

> is to be in the accompaniment of a Town Councilman (in person or by conference call).  Under no circumstances should you or your employees be in direct one on one communication with the Supervisor until further notice.  While any Councilman can facilitate communication we would prefer you contact your Committee chair or Co-chair Councilman first if possible.

*Id*.  According to Perfetti, the Board members issued this memo because they were concerned Sotak "would likely attempt to discuss the investigation with the department heads and intimidate or retaliate against them for participating in the investigation."  Perfetti Aff., Dkt. No. 65-27 ¶ 24.

Later that day, Bertoni, Mack, Augostini, and Town Attorney Pope met with plaintiff to "advise[ ] [her] that complaints had been lodged against her and that an independent investigation was going to be conducted."  Defs.' Facts ¶ 39.  The Board members and Pope also discussed the contents of the memo, including their instruction that employees should avoid meeting with plaintiff one-on-one.  *Id*. ¶ 40.

In Sotak's view, this memo was "immediately a massive problem."  Sotak Dep. 96:12-13.  Plaintiff was "humiliated and infuriated by it."  Sotak Decl. ¶ 9.  As she explained in her deposition:

> I discussed [the memo] with Alan Pope because as the Town of Union supervisor, you had asked about duties, the Town of Union supervisor is in charge of the finance, really, for the town.  I have to – the deputy can sign checks, but the supervisor goes through with the comptroller what checks and what's going out and this happens usually on Wednesday afternoon for the checks on Thursday and Friday to be out.
>
> So right away, I couldn't meet with Laura [Lindsley, the Comptroller] because I wasn't supposed to meet.  And we tried to – like, who could be there, and I guess it happened that – but nobody knew that Augostini was in the meeting, but it was like, how am I going to sign checks if I can't talk to the comptroller? It was just a mess.

Sotak Dep. 96:13-97:4.

Sotak asserts it had become "evident" that she was "the target of a campaign by the other members of the Town Board, all males, to drive [her] out of office."  Sotak Decl. ¶ 9.  As plaintiff explains, as Supervisor she "was required to deal with Town Department heads, as well as other Town employees, on a regular basis.  The directive by the other Town Board members severely hampered [her] in the performance of [her] duties."  Sotak Decl. ¶ 9.

Town Attorney Pope acknowledges in his affidavit that this may have complicated the day-to-day functioning of Town government.  According to Pope, the Town Supervisor is expected to be "at Town Hall on almost a daily basis" while Board members, on the other hand, only come to Town Hall "for department meetings as needed, work sessions and for Town Board meetings."  Pope Aff. ¶ 8.

On January 25, 2017, Attorney Sweeney met with Bertoni and Mack, who caught him up to speed on the two workplace complaints about Sotak that had come from the Town's department heads.  Sweeney Aff., Dkt. No. 65-29 ¶ 4.  According to Sweeney, Bertoni and Mack "asked that [he] investigate whether the complaints had merit, specifically whether the Town Supervisor had violated any federal law, state law or Town policies in her reported treatment of Town personnel, and to make appropriate recommendations."  *Id*.  Sweeney asked for list of potential witnesses and got right to work.  Defs.' Facts ¶ 44.

On January 26, 2017, Sweeney met with the Town's various department heads and explained that he planned to interview them in connection with the investigation.  Sweeney Aff. ¶ 6; Defs.' Facts ¶ 43.  Thereafter, Sweeney reviewed the Town's written policies and interviewed twenty-two witnesses, including current and former Town officers, department

heads, and other employees.  Defs.' Facts ¶¶ 45, 52-53.  According to defendants,

Sweeney's investigation proceeded independently of them; they were not present for any of

the interviews and did not control the manner or method of questioning.  Defs.' Facts ¶ 50.

Over the weekend, Mack sent to fellow Board members Bertoni and Augostini and to

Town Attorney Pope a short e-mail that read:

> Got a couple calls from Rose [Sotak] this weekend, one in which she
> told me it was a "Witch Hunt".  Though I kept it to myself I had to
> laugh thinking it really was!

Ex. 2 to Sotak Decl., Dkt. No. 70-5.

On January 30, 2017, Sweeney sent to Sotak a letter in which he explained he had

been retained by the Board "to investigate allegations that [she] may have violated Town of

Union [ ] policies.  Specifically, it is alleged that you may have violated Town policies in the

manner that you dealt with Town employees in the performance of your duties."  Ex. 1 to

Sotak Decl., Dkt. No. 70-4.

Sweeney's letter offered Sotak an opportunity to be interviewed as part of the

investigation, but she declined.  Ex. 1 to Sotak Decl.; *see also* Sweeney Aff. ¶ 7; Defs.'

Facts ¶ 51.  By this time, plaintiff had hired counsel to help her defend against what she

perceived as a hatchet job by the all-male Board.  *See* Defs.' Facts ¶ 51.

On February 4, 2017, Sweeney closed his investigation and, on February 4, 2017,

presented a summary of his results to the Board.  Sweeney Aff. ¶¶ 10-11; *see also* Defs.'

Facts ¶ 62.  According to the Executive Summary of the report, Sweeney found that Sotak

had, *inter alia*, "regularly and repeatedly used loud, profane and patently offensive language

towards certain members of Town Council, the Town Attorney, several Department Heads

and other Town employees in the course of her duties."  Ex. A to Sweeney Aff., Dkt. No.

65-29 at 9-14 ("Executive Summary").

Sweeney also found that Sotak had "threatened at least three (3) Department Heads, the Town Attorney, and other Town employees with the loss of their employment."  Executive Summary at 11.  According to plaintiff, at least one witness interviewed by Sweeney told her that some of his statements were not accurately reported.  Sotak Dep. at 104:8-15.  In his Executive Summary, Sweeney concluded that Sotak had created a "toxic work environment."  Ex. A to Sweeney Aff. at 12.

But Sweeney told the Board that their options were limited.  As Sweeney explained, he would ordinarily "recommend that a manager who was found to have engaged in the conduct should be dismissed."  Ex. A to Sweeney Aff. at 12.  However, according to Sweeney this would be "extremely difficult to accomplish" because Sotak, as an elected official of the Town, could only be removed under New York Public Officers Law § 36.  *Id.*

So instead, Sweeney offered six "recommendations" to the Board:

> a.   Institute a new complaint reporting system which utilizes an outside HR consultant to investigate and respond to future personnel complaints of abuse and threats made against the Town Supervisor;
>
> b.   Continue to offer affected employees with the right to have another individual present for meetings with the Town Supervisor;
>
> c.   Provide anti-harassment and respect in the workplace training to Town Council and all other Town employees;
>
> d.   Consider a resolution re-affirming Town Council's commitment to anti-harassment and respect in the workplace;
>
> e.   Revise existing policies to strengthen the Town's commitment to anti-harassment and respect in the workplace;
>
> f.   Without impairing the at-will nature of some Town positions,

adopt policies that provide for annual employee evaluations.

Ex. A to Sweeney Aff. at 12-13.

Notably, Sweeney did not provide the Board members with written copies of his full report.  Sweeney Aff. ¶ 12.  Citing witness confidentiality concerns, Sweeney told the Board members that they could review the report in person at his office.  *Id*.  Over the next few days, Bertoni, Mack, Augostini, and Perfetti went down to Sweeney's office and reviewed the complete report.  Defs.' Facts ¶ 65.

On February 10, 2017, the Board met "to discuss Attorney Sweeney's findings and recommendations."  Defs.' Facts ¶ 67.  Sweeney called Sotak's counsel, Attorney Albert Millus, Jr., to advise him that the Board "intended to meet to consider several resolutions regarding the matter," including whether (1) to accept the Executive Summary and place it on file and (2) to hire Sweeney's firm "to research and analyze" whether "any grounds existed to remove [plaintiff] from office."  Millus Decl., Dkt. No. 70-1 ¶ 10.

According to Attorney Millus, Sweeney also

> made reference to the fact that Ms. Sotak was in the real estate business, and asked whether she was prepared to face the embarrassment that would result from the publication of the Executive Summary. [Attorney Millus] understood Mr. Sweeney's comment to be an invitation for Ms. Sotak to resign rather than face the humiliation that she would face if the Executive Summary were to be made public. [Attorney Millus] point blank asked Mr. Sweeney whether he was suggesting that she resign, and he responded, in words or substance, that she would have to do what she felt she had to do.

Millus Decl. ¶ 11; *see also* Ex. 4 to Sotak Decl., Dkt. No. 70-7 (letter from Millus to Sweeney explaining that plaintiff refuses to resign and will "vigorously resist any attempts to remove her" from elected office).  Defendants, for their part, contend that none of them ever "directed

Attorney Sweeney to threaten Plaintiff into resigning her position."  Defs.' Facts ¶ 69.

On February 15, 2017, Sotak issued a press release in an effort to defend herself against what she perceived to be the all-male Board's attempt to remove her from office for trying to hold Moody accountable for his poor job performance.  Ex. 5 to Sotak Decl., Dkt. No. 70-8.

In this press release, Sotak denied that she had ever "acted in an inappropriate fashion in [her] dealings with Town employees" and asserted that the Board's unilateral actions were "unauthorized, inappropriate, and highly irregular."  Ex. 5 to Sotak Decl.  The press release also stated that plaintiff wanted to "keep [her] focus on [her] vision for the Town of Union residents."  *Id*.  Shortly after she issued this press release, unidentified Town sanitation workers rejected plaintiff's trash pickup with a mocking, handwritten note stating that "we must keep our focus on our 'vision' for keeping the planet healthy."  Ex. 7 to Sotak Decl., Dkt. No. 70-10.

Thereafter, Sotak requested a copy of Sweeney's full, unredacted report.  Sotak Decl. ¶ 14.  When the Board refused to hand it over, Attorney Millus, on plaintiff's behalf, made a Freedom of Information Law ("FOIL") request for the report.  Millus Decl. ¶ 17; Defs.' Facts ¶ 72.

Board members introduced resolutions related to Sweeney's investigation at the Board meeting scheduled that same day, but plaintiff (who was present for this meeting) "chose to hold over the vote for their adoption" until the next meeting of the Board.  Defs.' Facts ¶ 70.  This "was met with hostility by one or more of the defendants," but the Deputy Town Attorney "advised that Ms. Sotak had the absolute right, under the Town's rules of parliamentary procedure, to do so."  Millus Decl. ¶ 18.

On February 16, 2017, "the lead story in the Binghamton print media revealed the contents of the Executive Summary."  Millus Decl. ¶ 20.  Defendants contend this was a public document, but plaintiff asserts that it could not be made public until *after* the Board adopted it, which it had not yet done at that point.  *See* Pl.' Response, Dkt. No. 70-3 ¶ 71.  In plaintiff's view, someone had leaked it to the press.

Defendants contend that they did not leak the Executive Summary to the media.  Defs.' Facts ¶¶ 74-77.  However, Sotak's counsel points out that "the only persons who were privy to the Executive Summary were defendants, Mr. Sweeney, and Town Attorney Pope."  Millus Decl. ¶ 20.  And plaintiff testified that Augostini, Bertoni, and Mack were all on personal terms with several local reporters.  Sotak Dep. at 108:16-109:8.

Sotak also recounted a story in which Bertoni became upset when she refused to authorize an insurance claim shortly after becoming the Town Supervisor.  Sotak Dep. at 123:1-124:20.  Bertoni acknowledges that this happened, but denies that a chance for "revenge" against plaintiff would have motivated him to leak the report.  *See* Bertoni Aff., Dkt. No. 65-24 ¶ 13.

On February 28, 2017, the Broome County District Attorney subpoenaed the Town for documents related to the investigation into Sotak.  Defs.' Facts ¶ 78; Ex. 11 to Millus Decl., Dkt. No. 70-14.  Defendants contend they did not instigate this investigation; they claim to have had no contact or involvement with the DA's Office or with any other law enforcement agency.  Defs.' Facts ¶¶ 79-80.  However, the Town did hand over a trove of documents in response to the subpoena.  *Id*. ¶¶ 81-82.  The Court granted defendants' request to file this document production under seal.  Dkt. No. 78.  To date, a copy has not been filed with the Court.

- 16 -

After the news about Sweeney's investigation broke in the local press, the Board began to receive "numerous" FOIL requests for copies of the full report, including one from Sotak, who had still not received a copy.  Defs.' Facts ¶ 85.  To avoid having to release the full report, the Board instructed Town Attorney Pope to seek in state court a declaration that Sweeney's report "was not subject to disclosure or if it [was] subject to disclosure that it be disclosed in redacted form."  Defs.' Facts ¶ 87.

The Town filed this petition on March 6, 2017, Ex. 12 to Millus Decl., Dkt. No. 70-15, but withdrew it after the assigned state court judge advised Town Attorney Pope that the responsibility for making decisions about redaction and/or release of the report belonged to the Board, not the state court system.  Pope Aff. ¶ 61; *see also* Millus Decl. ¶ 32.

On March 29, 2017, a Broome County grand jury returned an indictment against Sotak charging her with one felony count and four misdemeanor counts of corruption.  Millus Decl. ¶ 27; *see also* Ex. 13 to Millus Decl., Dkt. No. 70-16.  Plaintiff was arrested and taken to the Broome County Jail, where she was photographed and fingerprinted.  Sotak Decl. ¶ 17.  Sotak moved to dismiss the indictment.  Millus Decl. ¶ 34.

On July 12, 2017, Broome County Court Judge Kevin P. Dooley granted Sotak's motion to dismiss.  Ex. 22 to Millus Decl., Dkt. No. 70-25.  Judge Dooley noted that the indictment was based almost exclusively on testimony from Moody (the disgruntled department head) and Pope (the Town Attorney who had suggested to the Board that they hire outside counsel).  *Id*.  After reviewing the evidence presented to the Grand Jury, Judge Dooley found that it was legally insufficient to establish any of the crimes charged.  Ex. 22 to Millus Decl., Dkt. No. 70-25.

Judge Dooley also concluded that:

> the District Attorney had "improperly elicited and permitted
> prejudicial testimony concerning matters that were not relevant,
> constituted inadmissible hearsay, and also vouched for the credibility
> of the primary witness testifying before the Grand Jury.  These
> actions served to impair the integrity of the proceeding, resulting in
> prejudice to the defendant.

Ex. 22 to Millus Decl., Dkt. No. 70-25.

Thereafter, the Town produced to Sotak a redacted version of Sweeney's full report.  Millus Decl. ¶ 36; Pope Aff. ¶ 61.  According to plaintiff's counsel, the report "set[ ] forth a number of mostly petty and sometimes profane anecdotes from Town employees against Ms. Sotak, some of which went back years."  Millus Decl. ¶ 36; *see also* Ex. 26 to Millus Decl., Dkt. No. 70-29.  Ultimately, the Board did not take any action to remove plaintiff from office.  Millus Decl. ¶ 37.

In December 2017, "the Town received additional complaints, again by department heads, alleging similar conduct to that which was the subject of the original 2017 complaint."  Defs.' Facts ¶ 89.  The Board decided to conduct a second investigation into Sotak's conduct, and hired Sweeney again.  *Id*. ¶ 90; Sweeney Aff. ¶ 18.  Plaintiff was excluded from this decision-making process again.  Pl.'s Response ¶ 90.

Sweeney interviewed four witnesses and concluded his second investigation on February 22, 2018.  Sweeney Aff. ¶¶ 20, 23.  This time, Sweeney found that plaintiff "had engaged in harassment and other injurious behavior," including "yelling at subordinates," and "accusing them of unproven/unfounded transgressions in such a way that it would constituted 'harassment' and 'demeaning conduct'" under the Town's policies.  *Id*. ¶¶ 24-25.

Sweeney recommended to the Board that it (1) "continue to provide anti-harassment and respect in the workplace training"; (2) "continue to offer affected employees the right to

have another individual present in meetings with the Town Supervisor"; and (3) "re-affirm the Town Boards [*sic*] commitment to anti-harassment and respect in the workplace."  *Id*. ¶ 26.

Sotak was up for re-election in 2018, but decided not to run.  Millus Decl. ¶ 39; Sotak Decl. ¶ 20.  The events in dispute caused "tremendous emotional distress" from which she has not yet recovered.  *Id*. ¶ 21.

## III.  <u>LEGAL STANDARD</u>

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment is a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a "genuine" dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

"When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Accordingly, summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## IV.  <u>DISCUSSION</u>

Defendants contend they are entitled to summary judgment on all of Sotak's claims because plaintiff has not come forward with evidence to suggest that Bertoni, Mack,

Augostini, and/or Perfetti did anything improper.  Instead, defendants say, they safeguarded plaintiff's rights *and* the rights of the Town employees by completely outsourcing the personnel investigation to Sweeney, a neutral third party.  Defendants insist there is no evidence that they exerted, or attempted to exert, any influence on the District Attorney's decision to seek the indictment that was later dismissed by Judge Dooley.  In sum, defendants deny that any of them instigated the personnel investigation or the corruption prosecution because they had an axe to grind against plaintiff, whether because she was a female or for any other reason.

Sotak responds that of course defendants would make the self-serving claim that they were just worried about protecting the Town employees.  Plaintiff relies on circumstantial evidence in the record to argue that the all-male Board members closed ranks when she tried to hold Moody, another male, accountable for his subpar job performance.  Plaintiff argues the mere fact that defendants outsourced the "investigation" into the personnel complaints against her should not, *ipso facto*, shield defendants from judicial scrutiny.

Sotak emphasizes that the timing of certain events seems suspicious and argues there was a sharp distinction between how the Board members handled the employee complaints against her (as a female) and how they handled the prior incident at the golf tournament with Perfetti and the other Town employee (both males).

Sotak also points to Mack's internal e-mail to the other Board members joking about how the investigation into plaintiff was a "witch hunt" and to Judge Dooley's "blistering" opinion tossing out the charges against her (which were based principally on grand jury testimony from Moody and Pope) to assert that there are genuine disputes of fact over whether defendants' conduct was, *inter alia*, motivated by unlawful sex-based animus.

Defendants reply that Sotak's baseless cloak-and-dagger theories of collusion by the Board members are insufficient to raise a jury question on any of her claims.  They point out that the all-male composition of the Town Board was a product of the electoral process and emphasize that there is no testimony or other evidence establishing that the Board acted in a sexist way toward plaintiff or anyone else.

Defendants argue that they acted reasonably in deciding to investigate the employee complaints and in retaining outside counsel to do so after the Town Attorney recused himself.  And as for Sotak's claims about other personnel investigations being handled internally, defendants argue that the matter concerning Perfetti was handled differently because it was a one-off incident with a single employee that Perfetti self-reported to the Board.

## A. <u>Sex Discrimination</u>

Sotak asserts a § 1983 claim for sex discrimination, Am. Compl. ¶¶ 61-69, but it is unclear whether she has asserted a disparate treatment claim based on one or more specific adverse actions or a hostile environment claim based more generally on the entire course of events underpinning the parties' dispute.  *See* Pl.'s Opp'n, Dkt. No. 70, 15-18.[3]  Accordingly, the Court will analyze her claim under both discrimination theories.

"A plaintiff who claims sex discrimination in public employment in violation of the Fourteenth Amendment may bring suit pursuant to § 1983."  *Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019).  As relevant here, the Equal Protection Clause protects "public employees from various forms of discrimination, including hostile work environment and

---

[3]  Pagination corresponds with CM/ECF.

disparate treatment, on the basis of gender." *White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 392 (S.D.N.Y. 2011) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)).

Equal Protection-based § 1983 claims for sex discrimination "parallel Title VII discrimination claims in many respects." *Naumovski*, 934 F.3d at 212.  As relevant here, "[t]he basic elements of such claims, whether pursued under Title VII or § 1983, are similar:  (1) a plaintiff claiming disparate treatment under either statute must [demonstrate] that she suffered an 'adverse employment action' taken 'because of' her sex, and (2) a plaintiff claiming a hostile environment must [identify] offensive conduct based on sex that was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. (cleaned up).

However, there are some important differences to keep in mind.  Title VII imposes liability on a plaintiff's employer when its agents engage in misconduct (*e.g.*, when a supervisor hires, fires, or disciplines for an impermissible reason) or when the employer fails to take appropriate remedial action (*e.g.*, when it fails to stop other employees from creating a work environment that is hostile to a plaintiff).  *See, e.g.*, *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) ("Employers, not individuals, are liable under Title VII.").

Section 1983 demands a more particularized showing.  First, a § 1983 claim requires the plaintiff to show action taken by a defendant under color of state law.  *Naumovski*, 934 F.3d at 212; *see also West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983 a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.").

Second, a § 1983 claim requires the plaintiff to show an individual defendant's

"personal involvement" in the alleged violation.[4]  *Naumovski*, 934 F.3d at 212; *see also*

*Walker v. Schult*, 365 F. Supp. 3d 266, 284 (N.D.N.Y. 2019) ("[C]onstitutional torts cannot be

premised on a theory of *respondeat superior*.").  In other words, "[i]f a defendant has not

*personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983

action against the defendant."  *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014)

(emphasis in original).

Third and finally, a § 1983 plaintiff does not benefit from the more generous causation

standard found in Title VII.  "Under Title VII, a plaintiff may succeed simply by establishing

that sex (or another protected characteristic) was the motivating factor for any employment

practice, even though other factors also motivated the practice."  *Naumovski*, 934 F.3d at

213 (cleaned up).  The same is not true of § 1983, which requires a plaintiff who brings a

sex-based disparate treatment or hostile work environment claim to show that each

defendant's discriminatory intent was a "but-for" cause of the adverse employment action or

the hostile environment.  *Id*. at 214.

## 1. Disparate Treatment

Mindful of those important distinctions, "a § 1983 claim for sex discrimination is

analyzed under the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973), utilized in Title VII claims."  *Raspardo*, 770 F.3d at 125.  As the Second

---

[4]  This more demanding requirement does not mean that a supervisor is necessarily shielded from § 1983 liability.  As the Second Circuit has explained, "[t]he personal involvement of a supervisory defendant may be shown by evidence that:  (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring."  *Raspardo*, 770 F.3d at 116 (cleaned up) (applying the so-called *Colon* factors to a § 1983 claim for hostile work environment).

Circuit has recently cautioned, though, when applying this framework "courts must account for a § 1983 plaintiff's higher burden of producing evidence from which a jury could infer that the individual's discriminatory intent was a '*but-for*' cause of the adverse employment action." *Naumovski*, 934 F.3d at 214 (emphasis in original).

"Under *McDonnell Douglas* and its innumerable progeny, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of 'discrimination *vel non*;' and thus, (3) the burden shifts back to the plaintiff 'to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Hong Yin v. N. Shore LIJ Health Sys.*, 20 F. Supp. 3d 359, 371 (E.D.N.Y. 2014).

The *McDonnell Douglas* framework recognizes that "direct proof of intentional discrimination by an employer is hard to come by." *Reynolds*, 685 F.3d at 204.  Accordingly, "[t]his framework places the initial burden of establishing a prime facie case of discrimination on the plaintiff, who must demonstrate that:  (1) [she] is a member of protected class; (2) [she] was qualified for the position in question; (3) [she] suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Musante v. Mohawk Valley Comty. Coll.*, 270 F. Supp. 3d 564, 577 (N.D.N.Y. 2017) (citation omitted).  "A plaintiff's burden of establishing a *prima facie* case is *de minimis*." *Id*.

"Once the plaintiff clears this initial hurdle, '[t]he burden shifts to the defendant to offer 'legitimate and non-discriminatory reasons for the adverse employment action demonstrated

in plaintiff's prima facie case.'" *Musante*, 270 F. Supp. 3d at 77 (quoting *Croons v. N.Y. State Office of Mental Health*, 18 F. Supp. 3d 193, 202 (N.D.N.Y. 2014)).  The burden at this stage is also "light," and "[t]he [defendant] need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." *Id*. (citation omitted).  In other words, "[t]his burden is one of production, not persuasion; it can involve no credibility assessment." *Id*.

"If the defendant satisfies its burden of production, then the presumption raised by the prima facie case is rebutted and drops from the case." *Musante*, 270 F. Supp. 3d at 577 (citation omitted).  "At the final stage, the plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision—a burden that merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id*. (cleaned up).

"[I]n order to raise an issue of fact that is sufficiently material to defeat a motion for summary judgment, the plaintiff must produce more than simply some evidence; it must be enough evidence to support a rational finding that the defendant's explanation for the adverse action is actually a pretext to disguise discrimination." *Musante*, 270 F. Supp. 3d at 578 (citation omitted).  "In making this determination, a court may examine the strength of the plaintiff's prima facie case, the probative value of the proof that the [defendant's] explanation is false, and any other evidence that supports [or undermines] the [defendant's] case." *Id*. (cleaned up).

As an initial matter, this is an unusual scenario in which to apply anti-discrimination law.  The typical discrimination plaintiff is usually a subordinate employee who has been wronged by supervisors, who have direct control over the terms and conditions of the

plaintiff's employment, or sometimes by co-workers, who have an indirect ability to impact the terms and conditions of the plaintiff's employment by virtue of their shared working relationship. *See, e.g.*, *Demoret*, 451 F.3d at 145 (analyzing § 1983 discrimination claims brought by village employees against mayor and other governing officials). But this is a dispute between elected officials who appear to have limited power over the terms of conditions of each other's employment. Instead, the relationships between the Town Supervisor and members of the Town Board are at least nominally governed by provisions of state and local law.[5]

Sotak contends that defendants tried to get around the limitations imposed by state law by conjuring up the personnel investigation, imposing an unworkable "no one-on-one meetings" rule, and then referring her for prosecution by the DA's Office.[6] Defendants argue that plaintiff has failed to establish a *prima facie* case of sex discrimination because she never suffered an "adverse employment action." Defs.' Mem., Dkt. No. 65-31 at 12-13.

Even if she could identify one, defendants argue that there is no evidence of any sex-based discriminatory animus because Sotak was not treated differently than any other Town officials against whom workplace complaints were lodged. Defs.' Mem. at 13-16. According to defendants, the only slightly comparable incident is the prior investigation into Perfetti as a result of what happened at the golf tournament, but defendants claim the actual

---

[5]  For instance, the parties seem to agree that Sotak's removal as Town Supervisor would have been governed New York law, which requires a resident–citizen to bring an application for removal in the appellate division. N.Y. Pub. Off. Law § 36.

[6]  As will be discussed *infra*, there is no evidence that the District Attorney's investigation was not an independent decision by the prosecutor. But at least one court in this Circuit has held that even an unfounded referral to the District Attorney for a criminal investigation does not qualify as an adverse *employment* action. *Boylan v. Arruda*, 42 F. Supp. 2d 352, 355 (S.D.N.Y. 1999) (discussing adverse-action requirement in the First Amendment context).

circumstances of that investigation were different because it involved an isolated incident that occurred off Town property.  *Id*.

Upon review, Sotak's § 1983 disparate treatment claim fails because the various events about which she complains do not qualify as adverse employment actions under the governing law.  "An adverse employment action is 'a materially adverse change in the terms and conditions of employment.'"  *Radice v. Eastport S. Manor Cent. Sch. Dist.*, 437 F. Supp. 3d 198, 211 (E.D.N.Y. 2020) (quoting *Clay v. Cty. of Suffolk*, 404 F. Supp. 3d 737, 755 (E.D.N.Y. 2019)).

"An adverse employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices [ ] unique to a particular situation."  *Radice*, 437 F. Supp. 3d at 211 (cleaned up).

"While there is no exhaustive list of what constitutes an adverse employment action, courts have held that the following actions, among others, may qualify:  discharge or demotion; denial of a provisional or permanent promotions; involuntary transfer that entails objectively inferior working conditions; denial of benefits; denial of a requested employment accommodation; denial of training that may lead to promotional opportunities; and a shift assignment that makes a normal life difficult for the employee."  *Little v. Natal Broad. Co., Inc.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002) (internal citations omitted).

Sotak, an elected Town official, did not suffer any material change in her salary, benefits, promotional or training opportunities, shift assignments, or job responsibilities as a result of any of the events described in the parties' papers.  While she asserts that the

employee complaints received by the Board were exaggerated or petty, she does not deny that Bertoni, co-chair of the Employee Committee, did receive at least two complaints:  one from Moody and one from another department head.

"Whether a particular action is materially adverse must be determined on a case-by-case basis." *Eldridge v. Rochester City Sch. Dist.*, 968 F. Supp. 2d 546, 557 (W.D.N.Y. 2013).  Importantly, "[i]ndividual liability under § 1983 for disparate treatment requires us to examine each individual defendant's actions to determine whether he treated [plaintiff] disparately on the basis of sex." *Raspardo*, 770 F.3d at 125.

In essence, Sotak asserts that these complaints were used by the Board as a pretext for initiating the investigation and for circulating the memo instructing Town employees not to meet with plaintiff in a one-on-one setting while the investigation ran its course.

But an investigation into alleged misconduct is generally not sufficient to establish material adversity; the adverse employment action usually comes from the consequences the investigation's result has on the employee's working conditions, such as discipline, a demotion, or even termination.  *See, e.g.*, *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) (holding that employer's application of preexisting disciplinary policies does not constitute an adverse action where the plaintiff was placed on paid administrative leave); *Rider v. Town of Farmington*, 162 F. Supp. 2d 45, 52-53 (D. Conn. 2001) (rejecting claim that investigation was materially adverse where plaintiff was not disciplined at its conclusion).

Sotak's complaints mostly involve joint action by the individual Board members who voted on official Town resolutions, such as whether to hire Sweeney or the Employee Committee's  decision to disseminate the "no one-on-one meetings" memo to department heads.  This adds an extra layer of analytical difficulty, but any alleged procedural

irregularities in the way that these Board votes were held, or how other Town procedural matters were conducted, are insufficient to constitute an adverse employment action for purposes of § 1983 for the same reasons set forth above—they did not work a materially adverse change in the terms and conditions of Sotak's employment.  This is especially so where, as here, at the conclusion of the personnel investigation Sweeney informed the Board members that they would be unable to take any materially adverse action against plaintiff because of her status as an elected Town official.

To be clear, this does not mean the Board could never take materially "adverse action" against Sotak in her capacity as Town Supervisor.  For instance, in *Dusanenko v. Maloney*, 560 F. Supp. 822 (S.D.N.Y. 1983), the trial court considered a § 1983 claim brought a Town Supervisor after political differences led the Town Board to, *inter alia*, vote to reduce the Supervisor's salary.  *Dusanenko* decided the matter on immunity grounds, but a substantial reduction in pay would seem to clearly qualify as an adverse employment action under the relevant body of case law.

Neither party has raised the specter of legislative immunity for the Board's actions, but that kind of targeted vote (*e.g.*, to reduce only the Supervisor's salary) might not give rise to legislative immunity today.  *Bierce v. Town of Fishkill*, 656 F. App'x 550, 554 (2d Cir. 2016) (summary order) (explaining that local legislators are not immune from § 1983 liability for "personnel decisions" and other "administrative" acts).

Sotak also argues that the "no one-on-one" rule made her part-time job as Town Supervisor more difficult.  That may be true, but she has not shown how it amounted to a materially adverse change in the terms and conditions of her employment.  *Cf. Morrison v. Potter*, 363 F. Supp. 2d 586, 591 (S.D.N.Y. 2005) ("Although . . . close monitoring may cause

an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.").

In other words, because the heightened scrutiny by the Board was not accompanied by any tangible employment consequences, like a decrease in pay, it cannot qualify as an "adverse employment action." *Benedict v. Malvern Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 325 (E.D.N.Y. 2014); *cf. Figaro v. City of N.Y.*, 198 F. Supp. 2d 555, 568 (S.D.N.Y. 2002) ("Being followed by supervisors is not a materially adverse employment action.").  In short, plaintiff has not "proffered] objective indicia of material disadvantage." *Bayer v. Cty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008).  Accordingly, plaintiff's § 1983 disparate treatment claim must fail.

However, assuming that Sotak is correct to claim that the investigation by Sweeney and the memo to department heads qualified as adverse employment actions, and granting her an inference of discrimination based on her claim these complaints were handled differently than the investigation into the golf incident with Perfetti, defendants have still identified a plainly legitimate, non-discriminatory reason for (1) ordering the personnel investigation; and (2) disseminating the memo to the department heads:  the need to investigate, and keep confidential, the employee complaints from the two department heads.

Thus, the burden shifts back to Sotak to show that this explanation was pretextual while being mindful of the more demanding burden imposed by § 1983.  As the Second Circuit has explained, "to establish 'pretext' under § 1983, a plaintiff must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action.  In other words, a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment

action." *Naumovski*, 934 F.3d at 215.

Even viewed in the light most favorable to her, Sotak's evidence is insufficient to shoulder this burden.  After parsing plaintiff's submissions carefully, it is clear that plaintiff's discrimination claim relies heavily on the fact that she was the lone female aligned against an all-male Board.  But absent a much more particularized showing, no reasonable jury could conclude that the "but-for" cause of any individual defendant's conduct (*e.g.*, by voting as a member of the Board to hire Sweeney or by choosing to disseminate the memo) was the product of purposeful sex-based animus.  *Cf. Naumovski*, 934 F.3d at 218; *see also Richardson-Holness v. Alexander*, 161 F. Supp. 3d 170, 178 (E.D.N.Y. 2015) ("Purposeful discrimination involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group."  (cleaned up)).[7]  Accordingly, plaintiff's § 1983 disparate treatment claim will be dismissed.

## 2. **Hostile Environment**

"In order to establish a claim of hostile work environment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create and abusive working environment.'" *Demoret*, 451 F.3d at 149 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "Plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Id*. (citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733,

---

[7] Sotak suggests she declined to run for re-election as a result of this mistreatment.  A plaintiff whose employment is "constructively" terminated can satisfy the adverse-action requirement, but only if the working conditions are so awful that a reasonable person would have felt compelled to resign.  *See, e.g.*, *Stofsky v. Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 299 (S.D.N.Y. 2009).  That test is not met in this case, either.

745 (2d Cir. 2003)).

Upon review, there is insufficient evidence from which a jury could reasonably conclude that any of the individual defendants engaged in the kind of objectively hostile and abusive conduct necessary to sustain this kind of § 1983 claim.  As the Second Circuit has explained, the level of severity required to demonstrate a hostile work environment under § 1983 is substantially similar to the standard set out in Title VII case law.  *Naumovski*, 934 F.3d at 221.  Importantly, however, a § 1983 hostile work environment claim depends on a showing that (1) one or more of the individual defendants were actually "personally involved" in the misconduct that altered the plaintiff's working environment; and (2) that the conduct at issue was a "but-for" cause of the hostile environment.  *Id*. at 222; *see also Raspardo*, 770 F.3d at 115.

Even viewed in the light most favorable to Sotak, there is little, if any, evidence to suggest that any individual defendant's conduct was motivated by unlawful sex-based animus.  Defendants' joint memo to the department heads was certainly perceived by plaintiff to be intrusive, since it interfered with her ability to conduct day-to-day operations for the Town.  And plaintiff clearly thought that Sweeney's outside investigation into her workplace conduct was unwarranted and unfounded.

But Sotak does not dispute the fact that Moody did complain to Bertoni about plaintiff's workplace behavior, or that another department head also came forward to lodge a complaint against her.  Under those circumstances, the decision by the Board members to investigate the allegations, and to issue the memo in an attempt to exert control over the situation while the investigation played out, simply could not be found *objectively* hostile and abusive.

The same is true of Mack's "witch hunt" e-mail and the other isolated incidents

described by Sotak in her declaration and deposition.  While these events were subjectively

perceived by plaintiff to be evidence of discriminatory animus, they do not meet the relatively

demanding objective component of the hostile work environment standard.  *Demoret*, 451

F.3d at 149.  That is especially true in the § 1983 context, since Sotak would need to

convince a jury that each defendant's own, personal misconduct was a "but-for" cause of the

hostile environment.  *Naumovski*, 934 F.3d at 222.[8]  Accordingly, plaintiff's § 1983 hostile

work environment claim will be dismissed.

### B. Malicious Prosecution

Sotak has asserted a § 1983 malicious prosecution claim.  Am. Compl. ¶¶ 70-80.  A

claim for malicious prosecution brought under § 1983 is "substantially the same" as a claim

brought under state law.  *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018).

Generally speaking, "[t]o prevail on a claim of malicious prosecution, a plaintiff must

establish:  (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of

probable cause, and (4) malice."  *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 496

(N.D.N.Y. 2017).

Notably, though, while malicious prosecution claims under § 1983 and New York law

are similar, they are not identical.  *See, e.g.*, *Bernshtein v. City of N.Y.*, 496 F. App'x 140,

142 (2d Cir. 2012) (summary order) (citation omitted).  There are a couple wrinkles to keep in

mind.  First, a § 1983 malicious prosecution claim requires the plaintiff to show "a seizure or

other perversion of proper legal procedures implicating the claimant's personal liberty and

---

[8]  In *Raspardo*, the Second Circuit suggested that planned, coordinated acts by multiple defendants could be considered together for the purpose of a § 1983 hostile environment claim.  770 F.3d at 115 (explaining that "uncoordinated and unplanned acts of harassment" cannot be considered together under § 1983's more demanding standard).  Applied here, this claim would still fail because no reasonable fact finder could conclude that the environment was *objectively* hostile.

privacy interests under the Fourth Amendment." *Hulett*, 253 F. Supp. 3d at 496 (cleaned up).  Second, the "favorable termination" element of a § 1983 malicious prosecution claim requires some "affirmative indications of innocence." *Lanning*, 908 F.3d at 25.[9]

The parties focus primarily on the first element; *i.e.*, whether Sotak has offered evidence from which a reasonable jury could conclude that one or more of the Board members, acting individually or perhaps as a group, "initiated" the criminal proceeding against her.  Defs.' Mem. at 20-23.

Defendants argue that Sotak has not identified any evidence that any of the named defendants colluded or coordinated with the District Attorney to pursue charges against plaintiff.  According to defendants, their only involvement in the criminal matter was to authorize the Town Board to respond to the District Attorney's subpoena.

"While malicious prosecution claims are generally brought against arresting or prosecuting officials, 'they can also be brought against individuals other than the arresting officer when such a person actively engaged in a plaintiff's prosecution.'" *Bornschein v. Herman*, 304 F. Supp. 3d 296, 302 (N.D.N.Y. 2018) (quoting *TADCO Constr. Corp. v. Dormitory Auth. of the State of N.Y.*, 700 F. Supp. 2d 253, 270 (E.D.N.Y. 2010)).

"Initiation" in this context is a term of art.  *Rohman v. N.Y. City Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000).  "To initiate a prosecution, a defendant must do more than report the crime or give testimony.  He must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Manganiello v. City of*

---

[9]  This issue comes up frequently for New York civil rights plaintiffs, who often win dismissal of criminal charges "in the interest of justice" under N.Y. PENAL LAW § 170.40.  As the Second Circuit has explained, a § 170.40 dismissal "is by itself insufficient to satisfy the favorable termination requirement as a matter of law." *Thompson v. Clark*, 794 F. App'x 140, 141 (2d Cir. 2020) (summary order).

*N.Y.*, 612 F.3d 149, 163 (2d Cir. 2010) (quoting *Rohman*, 215 F.3d at 217).

As relevant here, "a defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.'" *Ying Li v. City of N.Y.*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017) (quoting *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014)); *see also Chimurenga v. City of N.Y.*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) ("Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution.").

Upon review, Sotak's § 1983 malicious prosecution claim must be dismissed.  To be sure, plaintiff has *alleged* that "defendants colluded with the District Attorney" and *alleged* that they "played an active and improper role in the prosecution."  Pl.'s Mem. at 21. However, even viewed in the light most favorable to plaintiff, the facts that have been elicited in discovery would not permit a reasonable jury to draw that conclusion.  Moody's complaint about plaintiff, whether false or exaggerated, was turned over to Sweeney for an investigation (along with another complaint from an unnamed department head).  And Sweeney's investigation, whether performed in good-faith or not, produced a litany of additional Town employee complaints about plaintiff's workplace behavior.

Sotak contests the factual accuracy of at least one of the witness statements recorded by Sweeney in his report.  *See* Sotak Dep. at 104:8-15.  And plaintiff contends that most of Sweeney's report amounts to "petty and sometimes profane anecdotes . . . some of which went back years."  Millus Decl. ¶ 36.  But while the griping from her subordinates recorded in the report may be viewed by plaintiff as petty or trivial, she does not claim that the facts on which the report's recommendations are based are totally fabricated or completely false.

This information was later turned over to the District Attorney in response to the subpoena.  Regardless of motivation, then, there is insufficient evidence in the record to show that the District Attorney's decision to initiate the criminal proceedings against Sotak—whether the charges were well-founded or the product of some political calculation—was not the prosecutor's own independent determination.  *Cf. Dufort v. City of N.Y.*, 874 F.3d 338, 352 (2d Cir. 2017) (explaining that a prosecutor's intervening exercise of independent judgment ordinarily breaks the chain of causation necessary to show this element).  In other words, there is no basis on which to conclude any of the defendants played a sufficiently "active role" in initiating the proceedings by misleading or pressuring the prosecutor into action.  *Cf. Blake v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007) (denying summary judgment on malicious prosecution claim where police defendants knowingly provided a false eyewitness confession to an unknowing  prosecutor).

In reality, Sotak's § 1983 malicious prosecution claim seems based the tacit suggestion that Moody and Pope, the two grand jury witnesses on which the District Attorney's indictment heavily relied, gave false or exaggerated testimony before the grand jury.  Or maybe her claim is that these two individuals conspired with the Board members to give that kind of fabricated testimony once they learned that the District Attorney was looking into the matter.  After all, Judge Dooley's written findings certainly suggest that something inappropriate happened in the grand jury proceedings.

Sotak did not name Moody or Pope as a defendant.  But even if she had done so, the Supreme Court has explicitly foreclosed a § 1983 malicious prosecution claim against a grand jury witness based on that kind of testimony.  In *Rehberg v. Paulk*, 556 U.S. 356, 369 (2012), the Court held that grand jury witnesses enjoy absolute immunity from § 1983 claims

on that basis.  Accordingly, any § 1983 malicious prosecution claim based on those improprieties would have to be dismissed.

Notably, in *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 770 (N.Y. 2016), the New York Court of Appeals reached substantially the same conclusion about how to treat grand jury witness testimony when a plaintiff asserts a state law claim for malicious prosecution.  However, unlike the Supreme Court in *Rehberg*, the Court of Appeals explicitly left the door open for a future case in which "a witness's improper act of testifying in itself is such an appalling betrayal of justice, and such an abuse of the immunity that ordinarily attaches to testimony, that the immunity must yield."  *De Lourdes Torres*, 26 N.Y.3d at 770.

Because this state law distinction might be relevant to Sotak's state law malicious prosecution claim, the analysis in this section is confined to her § 1983 claim.  Accordingly, plaintiff's § 1983 malicious prosecution claim will be dismissed.

### C. Conspiracy

Sotak has also asserted a § 1983 conspiracy claim.  Am. Compl. ¶¶ 81-84.  "To prove a § 1983 conspiracy, a plaintiff must show:  (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Morpurgo v. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 331 (E.D.N.Y. 2010) ("To sustain a claim for conspiracy under Section 1983, a plaintiff must demonstrate that the defendant acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated the plaintiff's rights . . . secured by the constitution or the federal courts."  (citation omitted)).

"[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct evidence." *Pangburn*, 200 F.3d at 72 (cleaned up).  Importantly, though, "a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003).

Upon review, this claim must be dismissed.  As explained above, Sotak has not established an underlying constitutional violation.  *See, e.g.*, *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (dismissing § 1983 conspiracy where plaintiff failed to establish underlying § 1983 claims for false arrest or excessive force); *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (same).  Accordingly, plaintiff's § 1983 conspiracy claim will be dismissed.

### D.  <u>State Law Claims</u>

In addition to her state law malicious prosecution claim, Sotak has also asserted state law claims for defamation, Am. Compl. ¶¶ 87-95, intentional infliction of emotional distress, *id*. ¶¶ 96-101, and a *prima facie* tort, *id*. ¶¶ 102-07.

As a general matter, federal courts "have supplemental jurisdiction over all other claims that are so related to claims [over which the court has] original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  In other words, "[t]he state and federal claims must derive from a common nucleus of operative fact."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

"[O]nce it is determined that a supplemental claim is related to the claim within the court's original jurisdiction such that they form the same case or controversy, supplemental jurisdiction over the related claim is mandatory."  *Catzin v. Thank You & Good Luck Corp.*,

899 F.3d 77, 85 (2d Cir. 2018) (citation omitted).

The exercise of supplemental jurisdiction over related state law claims has its "justification . . . in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them." *Gibbs*, 383 U.S. at 726.

As the Supreme Court has explained, "*Gibbs* emphasized that 'pendent jurisdiction is a doctrine of discretion, not of plaintiff's right,'" and that it "articulated . . . a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns of concerns of values." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citation omitted).

Consequently, a federal court may decline to exercise supplemental jurisdiction where "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c); *see also Shahriar v. Smith & Wollensky Rest. Grp.*, 659 F.3d 234, 245 (2d Cir. 2011) (identifying the statutory factors).

However, even if one of the § 1367(c) categories apply, "a district court should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the value articulated in *Gibbs*: economy, convenience, fairness, and comity." *Catzin*, 899 F.3d at 85 (quoting *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004)).  As the Second Circuit has cautioned, "[t]he declining of supplemental jurisdiction must actually promote those values as 'the fact that one or more of the grounds

for declining to exercise supplemental jurisdiction set forth in section 1367(c) does not mean that dismissal is mandated.'" *Catzin*, 899 F.3d at 85 (quoting *Oneida Indian Nation of N.Y. v. Madison Cty.*, 665 F.3d 408, 439 (2d Cir. 2011)).

"Where, as here, a plaintiff's federal claims will be dismissed before trial, a district court should generally decline to exercise supplemental jurisdiction over any state law claims absent exceptional circumstances." *B.A. v. City of Schenectady Sch. Dist.*, 209 F. Supp. 3d 515, 528 (N.D.N.Y. 2016).  There are no exceptional circumstances present in this case.  Because summary judgment will be granted as to the § 1983 claims, the continued exercise of supplemental jurisdiction over Sotak's state law claims will be declined.  *See* 28 U.S.C. § 1367(c)(3).

These state law claims will be remanded to state court.  *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 354 F. Supp. 2d 293, 311 (S.D.N.Y. 2004) ("[W]hen a district court declines to exercise jurisdiction over state-law claims in a removed case, the Court may either remand or dismiss the state-law claims."); *see also Robbins v. City of N.Y.*, 254 F. Supp. 3d 434 (E.D.N.Y. 2017) ("Notwithstanding the absence of any authorizing language in the statute, the Supreme Court held in *Carnegie–Mellon* that district courts have discretion to remand removed state law claims, rather than dismiss them without prejudice, when the court determines not to exercise supplemental (then called 'pendent') jurisdiction.").

### E.  The Does

Sotak has not identified the Does, and the time in which to do so has long since passed.  *See, e.g.*, *Kenney v. Clay*, 172 F. Supp. 3d 628, 642 (N.D.N.Y. 2016) (dismissing Doe defendants where plaintiff failed to identify them by the close of discovery).  Accordingly, any claims asserted against the Does will also be dismissed.

## V.  CONCLUSION

The parties have asked the Court to wade into the aftermath of a power struggle between duly elected Town officials.  After careful review of the limited evidence marshaled by Sotak in opposition to dismissal, no reasonable jury could find in her favor on the § 1983 claims.  However, she may still find relief in state court, where this case began.

Therefore, it is

ORDERED that

1.  Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

2.  Plaintiff's claims against John Does No. 1 through 4 are DISMISSED;

3.  Plaintiff's § 1983 claims for sex discrimination, malicious prosecution, and conspiracy are DISMISSED;

4.  Jurisdiction over plaintiff's state law claims is DECLINED; and

5.  Plaintiff's state law claims are REMANDED to Supreme Court, Broome County.

The Clerk of the Court is directed to enter a judgment accordingly, transfer the remaining claims to Supreme Court, Broome County, and close the file.

IT IS SO ORDERED.


Dated:  November 4, 2020
          Utica, New York.

_____
United States District Judge